**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **Thomas E. Nangle**<br>**Plaintiff** | ) | |
| **vs.** | ) | **Case No. 05-029ML** |
| **Summit Sales Associates, Inc.**<br>**Defendant** | ) | |

**PLAINTIFF'S, THOMAS E. NANGLE, OBJECTION TO THE DEFENDANT'S MOTION TO DISMISS**

Now comes the Plaintiff, Thomas E. Nangle, and hereby objects to the Defendants Motion to Dismiss Pursuant to Rule 12(b)(6) for Failure to State a Claim. The Plaintiff relies upon the memorandum attached hereto and incorporated herein in support of his objection to the Defendant's motion.

Plaintiff,
Thomas E. Nangle,
By his attorney,

Timothy J. Robenhymer, # 4419
376 Broadway
Providence, RI 02909
(401) 521-8400
(401) 521-8405 - facsimile

**Certification**

I hereby certify that on the 15th day of April, 2005, a true copy of the within document was mailed, postage prepaid, to: George Lieberman, Esq., Tillinghast Licht LLP, Ten Weybosset Street, Providence, RI 02903.

5

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **Thomas E. Nangle**<br>**Plaintiff**<br><br>**vs.**<br><br>**Summit Sales Associates, Inc.**<br>**Defendant** | ) | **Case No. 05-029ML** |

**PLAINTIFF'S, THOMAS E. NANGLE, MEMORANDUM IN SUPPORT OF HIS OBJECTION TO THE DEFENDANT'S MOTION TO DISMISS**

Now comes the Plaintiff, Thomas E. Nangle, and hereby objects to the Defendants Motion to Dismiss Pursuant to Rule 12(b)(6) for Failure to State a Claim. The Plaintiff asserts that both Counts I and II of the Verified Complaint do state claims upon which relief may be granted. Consequently, the Plaintiff requests that the Defendant's motion be denied.

## I. Attorney's Fees Counts I and II

The Defendant first asserts that the claims for attorney's fees raised in Counts I and II of the Verified Complaint should be dismissed. The Defendant argues that there is no contractual provision allowing for the recovery of attorneys fees nor is there a statute authorizing the recovery of attorney's fees. See Def. Memo p. 4.

The Plaintiff submits that this Court has jurisdiction to hear this matter based on the diversity of citizenship among the parties. The Defendant correctly states that the Plaintiff is a Rhode Island resident and the Defendant is a New York corporation. Consequently, this Court must apply the substantive law of the State of Rhode Island.

In light of the foregoing, the Plaintiff relies on R.I.Gen.Laws § 9-1-45 as the basis for his claims for counsel fees from the Defendant. Admittedly, the claims for attorney's fees are not as artfully drafted as they could be, however, Rhode Island law does provide for the recovery of said fees. This Court has recognized the validity of this type of a claim in the past. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 66 F. Supp. 2d 317 (D.R.I. 1999).

The Rhode Island statute contains the following language: "The Court may award a reasonable attorney's fee to the prevailing party in any civil action arising from a breach of contract in which the court: (1) [F]inds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party..." The Plaintiff submits the evidence will establish there is no justiciable issue of law or fact regarding whether the Defendant breached the contract in this case.

**II. Count II Unjust Enrichment**

The Defendant correctly states that an unjust enrichment claim does not exist where there is a written contract between the parties. See Def. Memo p. 5. However, the posture taken by the Defendant, and or its agents before the filing of the Verified Complaint, was that there was no written contract between the parties. As result, the Plaintiff pled in the alternative and brought claims for both breach of contract and unjust enrichment.

If the Defendant's counsel will stipulate on the record that the document attached to the Verified Complaint as Exhibit A is in fact the contract between the parties, which is the basis of the Plaintiff's breach of contract claim, then the Plaintiff will voluntarily dismiss Count II. In the alternative, the Plaintiff is requesting

that the Defendant be compelled to answer the Verified Complaint in its present form. The Plaintiff shall then serve a set of requests for admission upon the Defendant, which will include a request to admit or deny the authenticity of Exhibit A attached to the Verified Complaint. The Plaintiff shall then amend the Verified Complaint to remove Count II.

## III. Conclusion

The Plaintiff asserts that Counts I and II of the Verified Complaint do assert claims upon which relief may be granted. Consequently, the Plaintiff is requesting that the Defendant's Motion to Dismiss be denied.

Thomas E. Nangle,
By his attorney,

Timothy J. Robenhymer, # 4419
376 Broadway
Providence, RI 02909
(401) 521-8400
(401) 521-8405 - facsimile

## Certification

I hereby certify that on the 15th day of April, 2005, a true copy of the within document was mailed, postage prepaid, to: George Lieberman, Esq., Tillinghast Licht LLP, Ten Weybosset Street, Providence, RI 02903.

# EXHIBIT

# A

# EXHIBIT

# A

LEXSEE 66 F.SUPP. 2D 317

**ROSS-SIMONS OF WARWICK, INC., ROSS-SIMONS, INC., ROSS-SIMONS OF BARRINGTON, INC., ROSS-SIMONS OF ATLANTA, L.L.C., and ROSS-SIMONS OF NORTH CAROLINA, L.L.C., Plaintiffs, v. BACCARAT, INC., Defendant,**

**C.A. No. 96-062L**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

**66 F. Supp. 2d 317; 1999 U.S. Dist. LEXIS 13698**

**August 31, 1999, Decided**
**August 31, 1999, Filed**

**DISPOSITION:** [**1] Plaintiffs' request for permanent injunction granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For PLAINTIFF(S): Steven E. Snow, Esq., Partridge, Snow & Hahn, Providence, RI.

For PLAINTIFF(S): Thomas R. Noel, Esq., Providence, RI.

For DEFENDANT(S): John H. Blish, Esq., Joseph V. Cavanagh, Jr., Esq., Blish & Cavanagh, Providence, RI.

For DEFENDANT(S): Jeffrey A. Oppenheim, Esq., Jane Kessler, P.C., New York, NY.

**JUDGES:** Ronald R. Lagueux, Chief Judge.

**OPINIONBY:** Ronald R. Lagueux

**OPINION:**

[*319] DECISION AND ORDER

RONALD R. LAGUEUX, Chief Judge

After a long journey through the federal judicial system, this case has at last reached its denouement. This Court is now prepared to render its decision on the merits following a bench trial. Plaintiffs (collectively, "Ross-Simons") allege that defendant Baccarat, Inc. ("Baccarat") breached the terms of a settlement agreement that disposed of an antitrust lawsuit filed by plaintiffs in 1993. To remedy these disputed contract violations, plaintiffs seek equitable relief requiring Baccarat to live up to the terms of its promise. For the reasons outlined below, this Court rules in favor of three plaintiffs and against the two others. The successful plaintiffs are entitled to a [**2] permanent injunction enforcing the bargain they made with defendant.

**I. Standard of Law for Bench Trials**

Pursuant to Federal Rule of Civil Procedure 52(a), this Court may enter judgment following a trial without a jury. See Fed. R. Civ. P. 52(a). In crafting a decision following a bench trial, the Court "shall find the facts specially and state separately its conclusions of law thereon." Id. It is within the purview of the trial court to weigh the credibility of witnesses for the purpose of making findings of fact. See id. The following findings of fact are based upon the evidence presented during the three days of trial conducted before this Court without a jury.

**II. Findings of Fact**

In 1992 Baccarat and Ross-Simons settled an antitrust suit filed by Ross-Simons. The suit alleged that Baccarat, the nonpareil manufacturer of French lead crystal, improperly refused to deal with Ross-Simons, a Rhode Island-based retailer of luxury items. In addition, Ross-Simons implicated two producers of fine French dinnerware and alleged that all three were conspirators in a horizontal pricing arrangement. The president of Baccarat at the time, Francois-Hugues de [**3]

Montmorin ("de Montmorin"), explained that Baccarat's refusal to sell its products to Ross-Simons was motivated by the manufacturer's dislike of the retailer's marketing and pricing policies. According to the terms of this agreement ("1992 Agreement"), titled "Agreement of Compromise and Settlement" and dated November 24, 1992, the pact was intended by the parties to resolve once and for all the business dispute between the manufacturer and retailer. Accordingly, the document explained that the parties "desire to reach a compromise and settlement of the aforementioned legal action."

[*320] The 1992 Agreement called for Ross-Simons to dismiss its lawsuit without prejudice in exchange for business concessions from Baccarat. Baccarat agreed to recognize Ross-Simons as an authorized dealer of Baccarat products, a status that entitled the retailer to "purchase and resell such products at such prices and upon such terms as are available to other authorized dealers."

Significantly, Baccarat agreed to subject its relationship with Ross-Simons to several negative covenants included in the settlement document. The most important provision stipulates that Baccarat "will not terminate Ross-Simons' [**4] status as an authorized dealer, nor otherwise discriminate against Ross-Simons in any manner, as a result of any failure or refusal by Ross-Simons to adhere to suggested resale prices or due to Ross-Simons' marketing through direct-mail catalogs." Finally, Baccarat promised to keep an open mind if Ross-Simons sought authorized dealer status for new retail branches: "Baccarat will in the future consider all applications by Ross-Simons for appointment and authorization of additional store locations not expressly covered by this Agreement under the same standards generally applied to other authorized dealers . . . ."

The 1992 Agreement stated no term of duration. However, several witnesses at trial indicated that the parties intended to establish a long-term relationship. De Montmorin testified that Baccarat always entered into partnerships with retailers for the long haul and that the arrangement with Ross-Simons was no different from any other in this respect. In fact, the negotiators discussed expanding their relationship in the future and de Montmorin told Ross-Simons executives of Baccarat's long-term philosophy of doing business.

This new arrangement was a marked change from Baccarat's [**5] long-standing attitude towards Ross-Simons. De Montmorin testified that Baccarat had refused to sell its products to Ross-Simons for years because of Ross-Simons' discounting practices, which were regarded as too declasse by the grande dame of French crystal. According to its president, Darrell Ross ("Ross"), Ross-Simons had developed a niche in the luxury goods market as a discount retailer of high-end goods. Furthermore, approximately eighty-five percent of the retailer's sales are generated by its catalog business, although it also operates several showrooms in Rhode Island and elsewhere. Each Ross-Simons catalog lists prices for nearly all items at below suggested retail along with "comparison" prices that show the manufacturers' suggested retail prices. In some cases, the discounts reach fifty percent. The strategy works. With gross sales of nearly $ 150 million annually, Ross-Simons has become one the nation's largest retailers of luxury goods such as jewelry, crystal, and dinnerware.

Yet for years before capitulating in 1992, Baccarat's management was unswayed by the success of the merchant they deemed a luxury goods parvenu. De Montmorin explained that discounting was an anathema [**6] to an image-conscious company like Baccarat. This faux pas by Ross-Simons motivated Baccarat's refusal to sell. The managers of the crystal maker thought that exposing its products to such resale tactics would cheapen the allure of the Baccarat name. Selling to Ross-Simons would also interfere with the "understanding" between Baccarat and its retail dealers on resale prices. De Montmorin testified that all retailers with whom Baccarat dealt in 1992 understood that abiding by the manufacturer's suggested resale prices was de rigueur for members of Baccarat's list of suitable merchants. Baccarat never opened an account with a dealer who was known to sell at a discount. Ross-Simons was left outside this exclusive club because Baccarat knew the retailer wouldn't play along. Ross-Simons tried to change the rules of Baccarat's game when it filed an antitrust lawsuit in 1992 alleging that Baccarat enforced an illegal resale price maintenance program.

[*321] With that history fresh in their minds, the parties executed the 1992 Agreement and began a more amiable relationship. Neither side expressed dissatisfaction with what soon became a financially fruitful relationship for both manufacturer and [**7] retailer. Sales of Baccarat crystal by Ross-Simons reached $ 1 million annually following the signing of the peace accord, making the discounter one of the largest sellers of Baccarat in the eastern United States. This detente was suddenly disrupted in the fall of 1994 when a new president took the helm of the crystal maker.

Jean Luc Negre ("Negre") replaced de Montmorin as president of Baccarat in October 1994. A veteran of the luxury goods business, he quickly decided that changes were necessary in the company's strategy. Negre believed that Baccarat products were overdistributed and when he saw Baccarat crystal in Ross-Simons' showroom in Atlanta, his suspicions were confirmed. Negre labeled this store a catalog showroom and considered Ross-Simons a mail-order company. Neither of these channels

was an appropriate venue for Baccarat products in Negre's mind.

The new president of the crystal maker soon became aware of the 1992 Agreement. He was advised by counsel that the agreement was terminable at will. At trial, he testified that he couldn't believe that a distribution contract could be perpetual. Based on Negre's own trial testimony, it is clear that the new president believed [**8] that Ross-Simons was a drag on Baccarat's image and that he intended to sever Baccarat's relationship with the retailer as part of his overall goal of enhancing the company's image.

Negre revealed this hostile attitude toward the discounter at an industry meeting in New York at Baccarat's showroom in October 1994. It was the first-ever tete-a-tete between Ross and Negre. When Ross approached Negre, the latter quickly took aim at what had been bothering him. Negre's opening salvo: "Why does Ross-Simons discount?" Unsatisfied with Ross's explanations of a successful retail strategy, Negre pressed on with his attack, lecturing Ross about the inappropriateness of openly discounting luxury items and explaining that no one else in the business advertises such price departures. The two men reached no understanding regarding the future of their business relationship. The conflict deepened.

In the summer of 1995, Baccarat refused to approve an authorized dealership for a new Ross-Simons' store slated to open in Raleigh, North Carolina. Negre and Howard Hyde, Baccarat's vice-president for marketing, testified that the company decided to impose a moratorium on new dealership locations while [**9] it pared back its distribution system and developed the manufacturer's first official authorized dealer program. Although Ross and Hyde spoke in April of that year about the plans for the Raleigh store, there is no evidence in the record that Hyde guaranteed that the new store would be granted authorized dealer status. Despite the moratorium, Baccarat allowed two new venues opening in 1995 to carry its products, a Nieman Marcus store and a Bloomingdale's. Negre explained at trial that these exceptions were made because both outlets had been planned for several years before the ban on new dealerships was implemented.

Ross-Simons encountered other problems during its impasse with the crystal maker's new regime. Baccarat introduced several new styles of stemware in 1995 and offered them only to a select few retailers. Again, Ross-Simons failed to make Baccarat's "A-list." For example, Negre explained at trial that the "LaLande" pattern was offered to twenty-five to thirty dealers. According to Negre, all of these dealers operated proper showrooms. Ross-Simons, he maintained, was ineligible for such a special product because its catalog showrooms were inappropriate settings for the promotion. [**10] Negre also explained at trial that he did not believe it proper to [*322] sell "LaLande" through catalogs. In addition to this snub, Baccarat refused to provide Ross-Simons with at least two other new stemware patterns, "Lyra" and "Vega," and one decorative crystal gift item, the "Golfer," in 1995. Baccarat officials referred to such items as "exclusives."

Based on the evidence adduced at trial, this Court finds that Baccarat's refusal to provide Ross-Simons with these new product lines was motivated, at least in part, by the disdain for Ross-Simons' discount pricing harbored by Baccarat management, Negre in particular. On the witness stand, Negre vehemently advocated his view that luxury goods should not be sold at a discount. At his first meeting with Ross, he badgered the retailer about Ross-Simons's discounting strategy. Negre could not understand why a company with "beautiful" stores would discount. Despite his positive impression of the aesthetics of Ross-Simons's Atlanta store, Negre conceded at trial that he thought Ross-Simons was bad for Baccarat's image. Negre noted that having Baccarat items in Ross-Simons's catalogs created an "image problem" for the crystal manufacturer par [**11] excellence. He also admitted that Ross-Simons did not receive "exclusives" because the retailer was a drag on the prestige of the manufacturer.

The coup de grace to the relationship came in October 1995 when Negre unveiled a tactic that would dramatically alter the partnership. Negre intended to alleviate two troublesome concerns tout de suite: Baccarat's overdistribution and Ross-Simons. An announcement from Negre dated October 17, 1995 trumpeted the launching of the new management's piece de resistance, an "Authorized Dealer Program" ("Proposed Agreement") aimed at "enhancing the overall image and prestige throughout the United States of [Baccarat's] world renowned name." Participation in the new program was mandatory for all dealers who wished to continue buying product from Baccarat. The deadline for submission of an executed Proposed Agreement was December 15, 1995. Ross-Simons refused to sign the document. Instead, Ross appealed to Negre for changes in certain terms of the Proposed Agreement that he believed were inimical to Ross-Simons' way of doing business. Ross also argued that imposition of these terms on the retailer by Baccarat constituted a violation of the 1992 Agreement. [**12] But the new program was a fait accompli. Negre refused to budge on any issue and insisted that Ross-Simons participate in the program exactly as it had been designed by Baccarat or not at all.

The Proposed Agreement represented a substantial departure from Baccarat's prior laissez-faire method of

managing its dealer relationships. Most disconcerting to Ross-Simons was paragraph nine of the new contract. Baccarat management understood that for a dealer in luxury goods, damage to reputation is often an irreparable injury. Therefore, they sought to protect their company's image through the new agreement. In this section, the participating dealer agrees not to "engage in any advertising or promotional practices which are damaging to the image, prestige and goodwill of Baccarat products and the BACCARAT trademark." The document reserves for Baccarat the exclusive right to judge whether a practice damages Baccarat's image. Two subsections in particular struck Ross-Simons hard. Paragraph 9(d)(i) provided:

> Dealer shall not advertise or market Baccarat products in or through any of the following vehicles or media which shall be considered damaging to the Baccarat image and prestige: [**13]
>
> > (i) Any publication, catalogue, or broadcast media program which is more than twenty-five percent (25%) devoted to promoting sales of merchandise at off price, comparison price or discontinued items.

Given Negre's opinion that Ross-Simons's stores were catalog showrooms, the retailer [*323] was also concerned that paragraph 9(e) provided that dealers "not use catalogue showroom merchandise formats" for the sale of Baccarat products.

Violation of any of these terms entitled Baccarat to terminate the dealer's authorized status. Ross-Simons management expressed specific concerns with the Proposed Agreement to Baccarat officials and suggested that the two parties negotiate a compromise. Ross-Simons, fearing that the Proposed Agreement would be its own "suicide note," refused to sign after Negre rebuffed the retailer's attempt at a truce. The December 15, 1995 deadline passed and in January 1996, Baccarat refused to fill orders from Ross-Simons.

Baccarat officials explained at trial that since the company launched the new authorized dealer program, all participating dealers advertise Baccarat products at suggested retail prices. The advertising restrictions in the Proposed [**14] Agreement forced several dealers to change their marketing approaches, including Bloomingdale's, Macy's, and Michael C. Fina, which changed its entire corporate image. Ross-Simons remains as the only Baccarat dealer in the country selling the crystal goods at discounted prices and advertising them in catalogs with comparison prices.

This Court finds that Baccarat's refusal to negotiate any of the terms of the Proposed Agreement was motivated, at least in part, by Baccarat's desire to rid itself of the successful, but troublesome, retailer. As this Court explained above, Negre was unable to overcome his contempt for a bourgeois retail strategy committed to discounting all types of luxury goods. That his personal disdain for Ross-Simons's raison d'etre spilled over into his dealings with the retailer is unsurprising and logical.

Because this Court's preliminary injunction, affirmed on appeal, requires Baccarat to continue dealing with plaintiffs, the retailer has suffered little harm so far. However, termination of its Baccarat authorized dealer status in the future would damage Ross-Simons's business in a serious, if unquantifiable, way. As several witnesses, including Negre, Hyde, [**15] and Ross, attested to at trial, Baccarat is a premiere brand of crystal. The company also distributes in the United States several de luxe lines of dinnerware. Ross-Simons bills itself as a luxury goods merchant with a comprehensive menu of offerings. As Ross explained at trial, Baccarat rests at the pinnacle of the crystal goods pyramid. As such, this Court agrees with Ross-Simons that the association of Baccarat with Ross-Simons lends an irreplaceable degree of prestige to the Ross-Simons image. Negre explained that Baccarat products are hand-crafted and held to exacting standards. But quality alone does not account entirely for the prestige of Baccarat's oeuvre. The Baccarat president described the company's long history of catering to the world's social and financial upper crust by designing the finest and most fashionable crystalware. As defendant's president was eager to acknowledge, Baccarat is a unique item; no substitute can be found on the market for these special products and the cachet attached to their label. Ross-Simons's inability to provide its customers with Baccarat products along with the absence of this brand from its catalogs and showrooms would harm the retailer's [**16] reputation within the image-conscious luxury goods business.

Termination of Ross-Simons as an authorized Baccarat dealer would harm the retailer in another way. Ross-Simons operates a bridal registry with 10,000 to 12,000 participants. This program generates $ 50 million annually for plaintiffs. In 1996, over 260 registry brides selected Baccarat items. These brides accounted for slightly more than $ 100,000 in sales of Baccarat products. Mary Morris, Ross-Simons's vice-president for merchandising, explained that many participating demoiselles who select Baccarat crystal products also order many other types of goods from Ross-Simons, such

as silverware and dinnerware. [*324] According to Morris, if Baccarat were removed as an option, many of the brides who desire Baccarat items would choose to register elsewhere. Furthermore, the registry program in many cases creates a life-long retail relationship between Ross-Simons and the bride's family. As years pass, individual items need to be replaced, households expand and require additional products, and families sometimes choose to upgrade their passe crystal, silverware, or dinnerware services. Therefore, loss of a bride's participation in the [**17] registry program because of Ross-Simons's inability to provide Baccarat products is likely to result in the loss of many years of that customer's business. Such losses, while real, are impossible to calculate with any degree of reliability.

**III. Procedural History**

Cognizant of these potential losses, plaintiffs were unwilling to let Baccarat write le dernier mot. Ross-Simons filed suit in 1996 in Rhode Island Superior Court alleging breach of the 1992 Agreement and tortious interference by Baccarat. After defendant removed the suit to this Court, Senior Judge Francis J. Boyle granted plaintiffs a preliminary injunction. The order granting a preliminary injunction required Baccarat "to immediately resume dealing with Ross-Simons in accord with the terms of the 1992 Agreement." See Order of May 16, 1996, at 11. Baccarat's appeal of Judge Boyle's order was rejected by the United States Court of Appeals for the First Circuit. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 20-21 (1st Cir. 1996) (affirming the grant of a preliminary injunction).

This writer was assigned this case in August 1997. In September 1998, this Court issued a written [**18] decision disposing of several defense motions: a motion for summary judgment on all counts, a motion to strike plaintiffs' claim for punitive damages, and a motion to dismiss a count alleging violations of the preliminary injunction. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 182 F.R.D. 386 (D.R.I. 1998). In that decision, this Court determined that although one count of the Amended Complaint was fatally defective, the central breach of contract claims of plaintiffs' case would survive the challenge of defendant's dispositive motion. The parties delivered opening statements in a bench trial on February 17, 1999. At the close of plaintiffs' evidence, this Court granted defendant's motion to dismiss the tortious interference count.

Therefore, four counts remain for determination by this Court. Count I alleges that termination of Ross-Simons as an authorized dealer constituted a breach of contract by Baccarat. Count II alleges that Baccarat's refusal to approve authorized dealer status for new Ross-Simons locations also constituted a breach of contract. In Count III, plaintiffs assert that Baccarat's actions violated the covenant of good faith and fair dealing [**19] implicit in the 1992 Agreement. The final surviving claim, Count V, seeks a permanent injunction prohibiting Baccarat from discriminating against Ross-Simons as an authorized dealer. At the close of the trial, the Court took these issues under advisement and additional briefs were filed in preparation for this fin de guerre.

**IV. Applicable Law**

**A. Breach of Contract**

This Court explained in its previously published decision in this case that Rhode Island courts favor the settlement of disputes outside of the litigation process. See Homar, Inc. v. North Farm Assocs., 445 A.2d 288, 290 (R.I. 1982); cf. Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 852 (1st Cir. 1987) ("As any litigator or judge can attest, the best case is a settled case."). Settlement agreements are treated as contracts and enforced under the rules governing contracts generally. See Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999); Mathewson Corp., 827 F.2d at 852-53; see also Interspace [*325] Inc. v. Morris, 650 F. Supp. 107, 109 (S.D.N.Y. 1986) (holding that under general [**20] contract principles, a settlement agreement "is binding despite the fact that it was never submitted for court signature and filing"). These agreements are "as binding as any contract the parties could make, and as binding as if its terms were embodied in a judgment." 15A Am. Jur.2d Compromise and Settlement § 25 (1976).

At its first line of defense, Baccarat attempts to rehash failed arguments initially made in support of its motion for summary judgment. Defendant asserts that certain defects in the 1992 Agreement undermine the vitality and circumscribe the duration of that contract. Au contraire. The 1992 Agreement is a valid contract, supported by sufficient consideration, and definite enough to be enforced according to its own terms by this Court. See Ross-Simons of Warwick, Inc., 182 F.R.D. at 395-98. Because the terms of the contract are clear and unambiguous, "the task of judicial construction is over and the Court will enforce those terms as they are written." Flanders & Medeiros Inc. v. Bogosian, 868 F. Supp. 412, 419 (D.R.I. 1994) rev'd on other grounds, 65 F.3d 198 (1st Cir. 1995).

This Court's previously published [**21] decision in this case also explained that the 1992 Agreement "falls within the well-established category of contracts that terminate upon the happening of a specific event." Ross-Simons of Warwick, Inc., 182 F.R.D. at 395. The plain language of the contract prohibits Baccarat from terminating its relationship with Ross-Simons because of

the retailer's discount pricing policy or its catalog sales strategy. See id. at 396. However, "were Ross-Simons to materially breach [Baccarat's standard terms of doing business], Baccarat would be justified in terminating the agreement." Id.

The potentially long-term nature of this arrangement is not so unusual. Despite Negre's protestations to the contrary, the 1992 Agreement is not a distribution contract. See id. at 395. As this Court, as well as the First Circuit, has explained, the 1992 Agreement is "an agreement for the settlement of a lawsuit." Id.; see Ross-Simons of Warwick, Inc., 102 F.3d at 17 ("The parties to the 1992 Agreement intended first and foremost to settle the antitrust litigation.").

As a vehicle for the resolution of an antitrust dispute, the 1992 Agreement [**22] is akin to a consent decree disposing of an antitrust prosecution brought by the government. As in the case of public antitrust controversies, the complainant in this case was concerned that the offending company was improperly restricting the free flow of the stream of commerce. Specifically, Ross-Simons alleged that Baccarat conspired with others to prevent Ross-Simons, a discounter, from dealing in certain luxury goods and undermining the conspirators' scheme of price regulation. De Montmorin confirmed the basics of Baccarat's scheme. The natural method of atoning for such an offense upon the marketplace is to undertake a promise to deal fairly in the future with the victims of the improper business practice. To achieve this end short of trial in the public sector, the federal government often negotiates consent decrees with the targeted businesses.

As practitioners in the antitrust field know, consent decrees often "continue in force for an indefinite and unlimited period." ABA Antitrust Section, Antitrust Consent Decree Manual 62 (1979). Although such agreements can also be limited to a finite duration, such as ten or twenty years, they have traditionally required compliance [**23] by the offending company for an unspecified time. See Practicing Law Institute, Governmental Antitrust Investigation and Enforcement by the U.S. Department of Justice, 524 P.L.I./Corp. 341, 360 (1986); Note, Flexibility and Finality in Antitrust Consent Decrees, 80 Harv. L. Rev. 1303, 1305 (1967).

[*326] Accordingly, enforcement of the 1992 Agreement for a long period of time, while Ross-Simons complies with its terms, is an altogether appropriate treatment of the settlement. While it is true that in the abstract "the constructs of laissez-faire and free enterprise" compel the common law to "legitimize[] the use of independent discretion by businesses to decide with whom they will and will not do business," Mortgage Guar. & Title Co. v. Commonwealth Mortgage Co., 730 F. Supp. 469, 472 (D.R.I. 1990), that same common law heritage also defends the principles of contract. The right to choose one's business partners may be self-circumscribed by a legitimately bargained-for exchange memorialized by a contract. In signing the 1992 Agreement, Baccarat agreed to modify its behavior and cease a course of business labeled anticompetitive by Ross-Simons. In doing [**24] so, Baccarat abdicated a portion of its autonomy, not unlike antitrust defendants who agree to terms with the government. The agreement mirrors a consent decree in several ways. Therefore, it is logical that it should also mimic the long-term effect of many of those decrees.

**B. Injunctive Relief**

Plaintiffs petition this Court for equitable relief in the form of a mandatory injunction. Whether an injunction should be granted is a matter reserved to the sound discretion of a federal court. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542, 94 L. Ed. 2d 542, 107 S. Ct. 1396 (1987) ("'[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.'" (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 313, 72 L. Ed. 2d 91, 102 S. Ct. 1798 (1982))); see also Women & Infants Hosp. v. City of Providence, 527 A.2d 651, 654 (R.I. 1987); 42 Am. Jur.2d Injunctions § 24 (1969). The authority to grant also encompasses the power to delimit the scope of any injunction issued. See DeNucci v. Pezza, 114 R.I. 123, 329 A.2d 807, 811 (R.I. 1974). Although courts have [**25] cautioned that mandatory injunctions are not to be granted routinely, it is entirely proper for a court of equity to award such relief when a party's interests can be protected in no other way. See St. Michael's Ukrainian Greek Catholic Church of Woonsocket v. Bohachewsky, 48 R.I. 234, 136 A. 878, 880 (R.I. 1927).

The criteria used to determine the merit of a plaintiff's request for a permanent injunction are largely the same as those used to judge the adequacy of a request for a preliminary injunction. See Amoco Prod. Co., 480 U.S. at 546 n.12; Diva's, Inc. v. City of Bangor, 21 F. Supp. 2d 60, 63 (D. Me. 1998). Plaintiff must establish: (1) that irreparable harm will result if the injunction is not granted; (2) that the harm plaintiff will suffer if the injunction is not granted outweighs the harm the defendant will suffer if the injunction is granted; (3) that the plaintiff is entitled to a judgment on the merits of the case; and (4) that the injunction is not adverse to the public interest. See Diva's, Inc., 21 F. Supp. 2d at 63; see also AFL-CIO Laundry & Dry Cleaning Int'l Union v. AFL-CIO Laundry, 70 F.3d 717, 718 (1st Cir. 1995) [**26] (listing the criteria used in considering a preliminary injunction).

Additionally, federal courts may only grant injunctive relief after determining that no available legal remedy would be adequate to compensate the plaintiff for its losses. See Amoco Prod. Co., 480 U.S. at 542; Infusaid Corp. v. Intermedics Infusaid, Inc., 739 F.2d 661, 668 (1st Cir. 1984); see also Ward v. City of Pawtucket, 639 A.2d 1379, 1382 (R.I. 1994) (applying the same rule under Rhode Island law). Accordingly, an injunction is often a particularly appropriate remedy where the injury suffered by the plaintiff is to its reputation or goodwill. See Valley v. Rapides Parish Sch. Bd., 118 F.3d 1047, 1056 (5th Cir. 1997) (holding that irreparable harm is established by a showing of a loss of reputation); Multi-Channel TV Cable [*327] Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994) (holding that irreparable harm is established by a showing of a loss of goodwill); Hypertherm, Inc. v. Precision Prods., Inc., 832 F.2d 697, 700 (1st Cir. 1987) (same); 11A Charles Alan Wright & Arthur R. [**27] Miller, Federal Practice & Procedure § 2948.1, at 159 (1995) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable."). Such injuries are irreparable in the sense that measuring their value in terms of dollars and cents is nearly an impossible task. An injunction may also be an appropriate remedy where the damage suffered by a plaintiff is too speculative, yet very real nonetheless, for a monetary award. See Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992) ("An injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate.").

When the relief sought is in the form of a mandatory injunction requiring that a party perform specific acts, the court should exercise even a further degree of caution in evaluating the propriety of plaintiff's request. See St. Michael's Ukrainian Greek Catholic Church of Woonsocket, 136 A. at 880 (warning that "the discretion to grant mandatory injunctions should be exercised sparingly, and only in cases where the right is very clear"); see also Dahl v. HEM Pharm. Corp., 7 F.3d 1399, 1403 (9th Cir. 1993) [**28] (holding plaintiff's request for a mandatory injunction to a standard of "heightened scrutiny").

In order to insure that Baccarat does not violate the 1992 Agreement, this Court's issuance of a mandatory injunction is the proper method to enforce the specific performance of the Agreement. The rule governing the issuance of injunctions that prevent breaches of contracts is stated as follows: "An injunction restraining the breach of a contract is a negative specific enforcement of that contract. The jurisdiction of equity to grant such injunction is substantially coincident with its jurisdiction to compel specific performance." Drew v. Socony-Vacuum Oil Co., 66 R.I. 170, 173, 18 A.2d 340 (1941) (quoting 4 Pomeroy's Equity Jurisprudence § 1341, at 3214 (2d ed. 1919)). In short, where it is proper for a court of equity to affirmatively specifically enforce a contract, the method so used to prevent its breach is by injunction. The reason for this is because "restraining the breach of a contract by injunction is merely a mode of specifically enforcing the contract." Drew, 66 R.I. at 173.

If a federal district court determines that an injunction is a proper [**29] form of relief, the court must follow the guidelines established by the Federal Rules of Civil Procedure in issuing the injunction. For the purposes of this case, Rule 65(d) is most pertinent. That rule provides that "every order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed. R. Civ. P. 65(d).

### V. Application of the Facts to the Law

With the factual and legal scaffolding in place, the Court may now play the role of jury and test plaintiffs' proof against the civil verdict standard of a preponderance of the evidence. In short, plaintiffs have carried the day. Despite the arduous nature of plaintiffs' trek through the legal bramble in their quest for the fruits of a contract born years ago, plaintiffs' have long enjoyed the advantage of being in the right. Further still, this Court will now grant plaintiffs a measure of assurance that the privileges once negotiated for will not again be so easily dismissed at the whim of defendant's agents. Equity empowers this Court to fashion relief [**30] that will stand the test of defendant's changing, and sometimes recalcitrant, hierarchy.

[*328] **A. Baccarat breached the 1992 Agreement**

Baccarat breached the 1992 Agreement in several respects. The most significant breach occurred when Baccarat refused to deal with Ross-Simons unless the latter agreed to the terms of Baccarat's new authorized dealer program. Through this new pact, which deemed to govern the future relations between the two entities, Baccarat sought to impose upon the retailer certain business restrictions. As Baccarat demonstrated at trial, the prohibitions, such as the ban on catalog showrooms and the limit on off-price advertising, can be justified by a legitimate business reason. Negre forcefully explained that Baccarat's survival as a luxury goods manufacturer depends on the strength of its image. The new Baccarat president hoped that the Proposed Agreement would insulate the company from associations with retailers who did not share Baccarat's disdain for off-price

advertising. As a business plan, this Court is in no position to judge the merits of the Proposed Agreement. However, as a legal matter, the Proposed Agreement is no tour de force, failing entirely [**31] to account for the privileges won by Ross-Simons in 1992.

The 1992 Agreement prohibited Baccarat from terminating its relationship with Ross-Simons because the retailer marketed Baccarat products through mail order catalogs and sold its goods at discounted, or comparison, prices. Yet this is precisely what happened when the crystal maker demanded that Ross-Simons change its sales strategy. Baccarat officials, including Negre, were well aware when the Proposed Agreement was distributed to dealers that Ross-Simons sold the overwhelming majority of its product through its catalogs and that almost all of the products sold through the Ross-Simons catalogs were advertised at discounted prices. This had been the retailer's formula for success for several years, dating back to a time before the 1992 Agreement was executed. Negre and his management team were also familiar with the terms of the 1992 Agreement which prohibited terminating Ross-Simons because of its discounting and cataloging practices.

Ross-Simons's discount catalog business could not have endured the Proposed Agreement given the twenty-five percent restriction on discounted items that the new agreement would have placed on [**32] the retailer's catalogs. This advertising limit falls squarely within the bounds of the 1992 Agreement -- it addresses discounting and catalog sales. Since Baccarat could not have terminated Ross-Simons expressly for its failure to comply with the twenty-five percent limit, it also could not terminate Ross-Simons in compliance with the 1992 Agreement for its refusal to sign a contract containing such a clause.

Plaintiffs have also proven by a preponderance of the evidence adduced at trial a second breach of the 1992 Agreement. Baccarat's failure to supply Ross-Simons with certain lines of product violated the clause in the settlement agreement which prohibits the crystal maker from discriminating against the retailer "as a result of any failure or refusal by Ross-Simons to adhere to suggested retail prices." As this Court explained in its findings of fact, Baccarat refused to provide Ross-Simons with several styles of stemware, including "LaLande." Negre admitted that Ross-Simons did not receive exclusives because Baccarat's association with the discount retailer tarnished the crystal maker's image. Of course, Negre believed that Ross-Simons was bad for Baccarat's image because he [**33] judged the retailer's habit of selling luxury goods at a discount as gauche. This sin in Negre's eyes was compounded by the Ross-Simons catalog, which brazenly advertised Baccarat's baubles at reduced prices for all the world to see. This practice especially upset elite retailers who did not discount. Baccarat took the heat from these merchants for the success enjoyed by Ross-Simons in discounting Baccarat items.

[*329] Defendant argues that Ross-Simons was not alone in being denied certain exclusives. In fact, some of the new product lines were provided to a small portion of the many authorized Baccarat dealers in this country. This argument ignores an important facet of the parties' relationship. Ross-Simons may not have been the only outcast, but it was the only outcast with a contract guaranteeing that Baccarat would not discriminate against it because of its sales philosophy. This Court has already found as a matter of fact that Baccarat was at least partially motivated by Ross-Simons' discounting to exclude the retailer from participation in the "exclusives." In doing so, Baccarat violated the 1992 Agreement as alleged by plaintiffs in Count I.

Plaintiffs do not fare so well on Count [**34] II. Baccarat did not breach the 1992 Agreement when it denied authorized dealer status to the new Ross-Simons store in Raleigh, North Carolina. That store, constituted as Ross-Simons of North Carolina, L.L.C., was not a party to the 1992 Agreement. Only three plaintiffs were parties to that settlement pact: Ross-Simons of Warwick, Inc., Ross-Simons, Inc., and Ross-Simons of Barrington, Inc. Therefore, only those three plaintiffs may allege causes of action for breach of the 1992 Agreement.

Plaintiffs chose a corporate form in which each individual store location is a separate and wholly-independent entity in the eyes of the law. Having constructed this corporate scheme, no doubt to take advantage of the limited liability it affords each entity, plaintiffs must now live with the consequences of their handiwork. The 1992 Agreement recognizes that Ross-Simons may seek to establish new authorized dealer locations. However, the contract refers to "additional store locations not expressly covered by this Agreement." It does not refer to new corporate entities. For example, if Ross-Simons of Warwick, Inc. chose to open a new store, that new location would enjoy the protection of the 1992 [**35] Agreement. But the new locations in Raleigh, North Carolina and Atlanta, Georgia were separately incorporated. As strangers to the 1992 Agreement, these two plaintiffs have no standing to claim any of the benefits of the 1992 Agreement. Accordingly, on Count II, this Court rules in favor of defendant. Furthermore, neither the Raleigh nor the Atlanta company may participate in any relief fashioned by this Court for the breaches of contract discussed above.

Two issues remain to be decided. Plaintiffs advance in Count III a cause of action alleging that defendant breached the implied covenant of good faith and fair

dealing contained in the 1992 Agreement. Under Rhode Island law there is an "implied covenant of good faith and fair dealing between parties to a contract so that contractual objectives may be achieved." Fleet Nat'l Bank v. Liuzzo, 766 F. Supp. 61, 67 (D.R.I. 1991) (quoting Ide Farm & Stable, Inc. v. Cardi, 110 R.I. 735, 739, 297 A.2d 643 (1972)). The Rhode Island Supreme Court, however, has held that a breach of the duty of good faith and fair dealing gives rise only to a breach of contract claim, not to a tortious cause of action. See [**36] A.A.A. Pool Service v. Aetna Cas. & Sur. Co., 121 R.I. 96, 98, 395 A.2d 724 (1978). The applicable standard in determining whether one has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary or unreasonable conduct. See Thompson Trading, Ltd. v. Allied Brewies Overseas Trading, Ltd., 748 F. Supp. 936, 942 (D.R.I. 1990) (citing Psaty & Fuhrman, Inc. v. Housing Authority of Providence, 76 R.I. 87, 92, 68 A.2d 32 (1949)); Landry v. Farmer, 564 F. Supp. 598, 611 (D.R.I. 1983) (Pettine, J.) (holding that defendant's actions did not breach the implied covenant of good faith and fair dealing because such actions were based on legitimate business considerations).

[*330] In this case, Baccarat's decision to no longer recognize the 1992 Agreement was neither arbitrary nor unreasonable. As stated in the facts, Negre found Ross-Simons' marketing and sales methods to be detrimental to Baccarat's premiere image. In addition, Baccarat was advised by legal counsel that the 1992 Agreement was terminable at will. The combination of erroneous legal advice and Baccarat's [**37] legitimate business concerns led to the violation of the Agreement. Consequently, although Baccarat did violate the terms of the 1992 Agreement, it did not breach the implied covenant of good faith and fair dealing.

In short, while every breach of the implied covenant may give rise to a breach of contract claim, not every breach of contract is necessarily a breach of the implied covenant of good faith and fair dealing. This is because the implied covenant of good faith and fair dealing is a counterpromise implied in every contract that the promisee will act in a manner consistent with the purposes of the contract. See 17A Am. Jur. 2d Contracts § 380 (1991). In this case there was a breach of the express promises contained in the contract, but not a breach of the implied covenant of good faith and fair dealing. Therefore, the Court finds for the defendant on Count III.

The final claim awaiting resolution is defendant's counter-claim for declaratory relief, a claim that inspires a bout of deja vu. Defendant argues for a second time before this Court that the duration of the 1992 Agreement was for a reasonable time. Predictably, defendant estimates that just about six and one-half [**38] years qualifies as a reasonable time. This Court again declines to follow defendant down that path. Baccarat's counterclaim is denied based on the legal reasoning contained in this Court's prior decision in this case. See Ross-Simons of Warwick, Inc., 182 F.R.D. at 395-97.

**B. Equitable relief is appropriate**

Defendant's liability for breach of contract is established. However, plaintiffs are unable to quantify their damages. However, this Court concludes that this failing is not fatal, because plaintiffs' losses are not "a matter of simple mathematic calculation," Graham v. Triangle Publications, Inc., 344 F.2d 775, 776 (3d Cir. 1965) (distinguishing between "ascertainable" business losses and "speculative elements that . . . are not susceptible to ready ascertainment in damages"). Rather, this failure of proof is a result of the very nature of the breach and plaintiffs' business, and is not caused by any deficiency in plaintiffs' trial tactics. Accordingly, an injunction may be an appropriate remedy in this case.

The four factors that merit consideration all point to the conclusion that an injunction should issue. This Court has already decided [**39] that plaintiffs prevail on the merits of their claim. This Court also concludes that the balance of equities favors plaintiffs. If the injunction is denied, plaintiffs will have gained little for the dismissal of the antitrust suit brought against Baccarat years ago. As Negre would readily admit, Ross-Simons cannot secure a substitute for Baccarat in the marketplace. The retailer would lose not only customers who desire Baccarat products, but would suffer the incalculable loss of reputation and prestige resulting from being shunned by the premiere crystal maker. On the other hand, an injunction forces Baccarat to maintain a relationship that has been financially lucrative for the manufacturer. Defendants did not explain at trial how a continuing association with Ross-Simons would damage Baccarat's international prestige in any substantial way.

Plaintiffs have also demonstrated to this Court's satisfaction that the damage caused by termination of the Baccarat relationship cannot be quantified, but that it is real nonetheless. Again, the Baccarat name cannot be replaced by another crystal manufacturer. This Court has addressed [*331] this factor above. Clearly, the loss is irreparable.

Finally, [**40] this Court is unable to identify any reason why enforcement of the 1992 Agreement might be contrary to the public interest. In fact, holding Baccarat to its bargain is very much in the public interest, especially since the manufacturer struck the bargain out of concerns over potential antitrust liability. Clearly, this factor, like the others, militates in favor of

plaintiffs' position. The permanent injunction enforcing the 1992 Agreement and prohibiting defendant's discriminatory behavior shall issue.

**C. Attorneys' Fees**

Plaintiffs are not entitled to recover attorneys' fees. A court may award attorneys' fees "to the prevailing party in any civil action arising from a breach of contract in which the court: (1) Finds that there was a complete absence of a justiciable issue of either the law or fact raised by the losing party; or (2) Renders a default judgment against the losing party." R.I. Gen. Laws § 9-1-45 (1997). Pursuant to this statute, attorneys' fees are awarded only if a Court determines that "there was a complete absence of a justiciable issue of either law or fact." UXB Sand & Gravel, Inc. v. Rosenfeld Concrete Corp., 641 A.2d 75, 80 (R.I. 1994). [**41] See also Hemingway v. Hemingway, 698 A.2d 228, 230 (R.I. 1997) (holding that the trial court had discretion to deny prevailing party's request for attorneys' fees because a justiciable issue was present). In UXB Sand & Gravel, the plaintiff had clearly not complied with the statute of frauds, but filed suit anyway. On appeal, the Rhode Island Supreme Court held that "the question of whether the statute of frauds was satisfied presented a justiciable issue even though the evidence eventually proved to be legally deficient." UXB Sand & Gravel, Inc., 641 A.2d at 80. As a result, the Court vacated the award of attorneys' fees to the defendants.

In this case, while the defendant was unsuccessful it had an arguable defense. There was a justiciable issue as to whether the 1992 Agreement continued to restrict Baccarat's subsequent business decisions with respect to its distribution arrangement with Ross-Simons. Although Baccarat ultimately failed in its argument, there was a justiciable issue present. Consequently, plaintiffs are not entitled to attorneys' fees under R.I. Gen. Laws § 9-1-45.

**VI. Conclusion**

For the foregoing reasons, this [**42] Court decides in favor of plaintiffs on the breach of contract claim in Count I and the request for permanent injunction in Count V. The Court decides in favor of defendant on Counts II and III.

Accordingly, this Court grants plaintiffs' request for a permanent injunction. Plaintiffs will submit a proposed form of judgment to the Court detailing the specifics of the injunction to issue, mindful of the requirements of Federal Rule of Civil Procedure 65(d). Such injunction will run in favor of the following plaintiffs only: Ross-Simons of Warwick, Inc., Ross-Simons, Inc., and Ross-Simons of Barrington, Inc. Finally, this Court rejects defendant's counterclaim for declaratory relief. It is so ordered.

Ronald R. Lagueux
Chief Judge
August 31, 1999